IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

LISA A. CLARK,                          )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )      Case No.
                                        )      15-4109-CV-C-REL-SSA
CAROLYN W. COLVIN, Acting               )
Commissioner of Social Security,        )
                                        )
            Defendant.                  )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Lisa Clark seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Titles II and

XVI of the Social Security Act ("the Act").  Plaintiff argues that the ALJ erred in finding

that plaintiff can perform substantial gainful activity because the hypothetical relied on

by the ALJ was not consistent with the residual functional capacity assessment, and the

number of jobs available is not significant.  I find that the substantial evidence in the

record as a whole supports the ALJ's finding that plaintiff was not disabled before June

1, 2013.  Therefore, plaintiff's motion for summary judgment will be denied and the

decision of the Commissioner will be affirmed.

*I.    BACKGROUND*

On August 24, 2011, plaintiff applied for disability benefits alleging that she had

been disabled since November 1, 1990.  Plaintiff's application was denied on

November 1, 2011.  Plaintiff requested a hearing before an administrative law judge;

however, she withdrew that request due to incarceration and her hearing request was

dismissed on July 16, 2012.  After her release, on April 30, 2013, plaintiff requested that

her claim be reopened.  On May 13, 2013, plaintiff's claim was reopened.  On October 10, 2013, a hearing was held before an Administrative Law Judge.  During the hearing, plaintiff amended her alleged onset date to July 14, 2010, because she had filed previous applications for disability benefits which were denied on July 13, 2010, by an administrative law judge, thus barring any claim for disability prior to that date.  On December 17, 2013, the ALJ found that plaintiff became disabled on June 1, 2013, but that she was not under a "disability" as defined in the Act prior to that date.  On March 23, 2015, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d

2

1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.   BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These

3

regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential

evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and

is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff and vocational expert Suzanne

Hullender, in addition to documentary evidence admitted at the hearing.

### A.     ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1975 through 2012:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1975 | $ 1,015.35 | 1994 | $ 0.00 |
| 1976 | 193.20 | 1995 | 0.00 |
| 1977 | 496.80 | 1996 | 0.00 |
| 1978 | 0.00 | 1997 | 0.00 |
| 1979 | 2,023.85 | 1998 | 0.00 |
| 1980 | 5,759.95 | 1999 | 0.00 |
| 1981 | 10,044.38 | 2000 | 0.00 |
| 1982 | 3,027.19 | 2001 | 0.00 |
| 1983 | 1,523.85 | 2002 | 0.00 |
| 1984 | 5,228.28 | 2003 | 1,443.14 |
| 1985 | 2,886.46 | 2004 | 3,981.22 |
| 1986 | 2,233.14 | 2005 | 9,061.82 |
| 1987 | 3,629.23 | 2006 | 3,141.92 |
| 1988 | 4,547.02 | 2007 | 5,442.98 |
| 1989 | 5,400.35 | 2008 | 14,533.12 |
| 1990 | 1,507.73 | 2009 | 946.52 |

| 1991 | 48.00 | 2010 | 0.00 |
| 1992 | 0.00 | 2011 | 0.00 |
| 1993 | 0.00 | 2012 | 0.00 |

(Tr. at 214-217).

**Function Report Adult - Third Party**

On October 10, 2011, plaintiff's mother, Ruth Ann Clark, completed a Third Party Function Report (Tr. at 258-266). Ms. Clark noted that she and plaintiff are together almost 24 hours a day, every day. Plaintiff has to be reminded to bathe and shampoo her hair, but she has no difficulty with any other personal care (Tr. at 259). Plaintiff cannot do laundry very often because the washer is in the basement and she cannot navigate the stairs. Plaintiff cannot pay bills, handle a savings account, or use a checkbook or money orders because she has no concept of the value of money (Tr. at 261). Plaintiff attends church and Alcohols Anonymous ("AA") meetings. Plaintiff has a very short fuse, is very bossy. Her impairments affect her ability to lift, sit, walk, climb stairs, squat, kneel, bend, stand, follow instructions, complete tasks, get along with others, remember and concentrate. Plaintiff lost her job at Kingdom Projects because she was "not a team player."

**Function Report**

On October 10, 2011, plaintiff completed a Function Report (Tr. at 267-274). She described her day as napping, watching television, eating, helping her mother with household chores, and going to AA meetings once a week. Plaintiff reported, as far as her ability to handle money, "If I get it, I spend it." (Tr. at 271).

6

**B.    SUMMARY OF MEDICAL RECORDS**

On January 27, 2009, plaintiff was evaluated upon being taken in custody.  She reported smoking a pack of cigarettes per day for the past 28 years (Tr. at 327, 330, 342, 475-477).  She reported asthma, joint pain, and a ruptured disc in her back (Tr. at 331, 477).  A mental health intake screening was done, but no "immediate" mental health referral was done; a routine mental health referral was done instead (Tr. at 331).  The following day she was observed to have a stiff gait (Tr. at 333).  She was prescribed Naproxen (non-steroidal anti-inflammatory).  Plaintiff had lab work done and tested positive for Hepatitis C (Tr. at 336).  It was recommended that she exercise, lose weight, and stop smoking (Tr. at 343, 345).  The same day she had a mental status exam and was noted to have good eye contact, normal speech, normal motor activity, fair insight.  She was described as cooperative with a low mood.  She was anxious and tearful.

On February 10, 2009, plaintiff had a nurse encounter and reported not being able to breathe at night causing her to awaken with panic attacks (Tr. at 457).  A mental status exam was performed and plaintiff was noted to have normal memory, concentration, appearance, and affect with no suicidal ideation and no current emotional distress.  Plaintiff's mental health records from Callaway Physicians and Callahan County Hospital were requested.

On February 11, 2009, plaintiff saw a doctor who assessed degenerative disc disease and told plaintiff to take Tylenol as needed for pain (Tr. at 346).  The following

day plaintiff reported experiencing shortness of breath (Tr. at 346, 492). She was scheduled for a pulmonary exam (Tr. at 347).

On February 18, 2009, plaintiff had a nurse encounter (Tr. at 457). "She has many medical problems and seeking mental health to get her out of having to complete treatment. She was explained the purpose of mental treatment. She is having some anxiety, but it is situational." Plaintiff's mental status exam was normal as far as memory, concentration, suicidal ideation, appearance, grooming, affect. She was under no current emotional distress.

On February 26, 2009, plaintiff reported that she has sleep apnea and is supposed to be using a CPAP[1] (Tr. at 351, 497). She reported that she was having difficulty breathing (Tr. at 497).

On March 2, 2009, plaintiff saw a doctor and reported having left shoulder pain since a motor vehicle accident in 2008; she reported left hand numbness and sleep apnea since 2008 (Tr. at 351). Plaintiff was on interferon for Hepatitis C. She described her asthma as asymptomatic, even though she had not used any asthma medications "for a long time" (Tr. at 490). On exam plaintiff had tenderness in her left shoulder, but normal grip. She weighed 287 pounds. She was assessed with possible capsulitis of the left shoulder and history of sleep apnea. Plaintiff was to be observed at night with oxygen saturation measurements to be recorded every 2 (Tr. at 351). X-rays

---

[1]Continuous positive airway pressure ("CPAP") therapy is a common treatment for obstructive sleep apnea. It includes a small machine that supplies a constant and steady air pressure, a hose, and a mask or nose piece.

of the left shoulder and cervical spine were ordered.  The doctor recommended that she

stop smoking and start exercising (Tr. at 491).

That same day she had a nurse encounter with regard to her mental health

treatment (Tr. at 458).  "She has calm[ed] down with less anxiety, concerns, and fears

of entering drug treatment.  She does not need mental health treatment nor

psychotropic medication at this time.  She is requesting psychotropic medication to help

her with explosive attitude."  Plaintiff's mental status exam was normal.

On March 3, 2009, plaintiff told the prison doctor that she had degenerative disc

disease (Tr. at 492).  Plaintiff had no swelling or inflammation.  She was told to continue

taking Tylenol as needed for pain and not to take Naproxen since she had no

inflammation.

On March 9, 2009, plaintiff reported that her "left hand is getting number all the

time." (Tr. at 352, 498).  Plaintiff had decreased grip in her left hand along with slight

swelling.

On March 11, 2009, plaintiff continued to complain of inflammation in her joints

(Tr. at 354).  The following day, records indicate that plaintiff continued to be evaluated

for her need for oxygen to prevent low oxygen saturation (Tr. at 355).

On March 12, 2009, plaintiff reported having had a motor vehicle accident in

2008 and having left shoulder pain, left hand numbness, and sleep apnea "since the

injury" (Tr. at 497).  Plaintiff reported a history of Hepatitis C and said she was on

interferon for that.  On exam plaintiff's heart and lungs were normal, left shoulder

abduction (raising the arm at the side of the body) was 80 degrees (normal is 180

9

degrees), she had tenderness in the post deltoid area, her grip strength was normal.  X-rays of the left shoulder and cervical spine were ordered.

On March 13, 2009, it was noted that plaintiff had periods of apnea with oxygen saturation of 79% for one to two minutes at a time during sleep (Tr. at 355).  That same day, plaintiff complained of severe back pain -- "it was the bed I slept in in TCU last night" (Tr. at 356, 502).  Plaintiff's gait was steady and she was able to get off and on the exam table; therefore, the nurse determined that plaintiff's pain was "not an emergency."

On March 16, 2009, plaintiff saw the prison doctor who assessed sleep apnea based on her oxygen saturation levels of 79% during sleep as well as observations of loud snoring and periods during which plaintiff appeared to stop breathing (Tr. at 357).  The doctor ordered a sleep study.  The sleep study was scheduled for May 6, 2009; however, plaintiff declined the sleep study (Tr. at 358).

On March 18, 2009, plaintiff had x-rays of her cervical spine which showed degenerative changes at C5-6 with osteophyte formation and disc space narrowing as well as evidence of paraspinous muscle spasms (Tr. at 357, 503).  X-rays of her left shoulder showed an old clavicle fracture and hypertrophic changes at the AC joint.

That same day plaintiff was seen by a nurse for mental health treatment (Tr. at 458).  Plaintiff continued to complain of feeling depressed.  "She continues to seek medication for anxiety and depression."  Plaintiff reported having difficulty dealing with drug treatment and the women in her unit.  Her mental status exam was normal except for an anxious affect.  "Currently adjusting to being in treatment and prison."

Case 2:15-cv-04109-REL   Document 29   Filed 08/29/16   Page 10 of 44

On March 20, 2009, plaintiff complained that she had seen the doctor about her back pain and was told "there is no need for Naproxen because there is no inflammation." She had been put on Tylenol, but she complained that it was not helping at all. Her back, hips and knees were causing her severe pain (Tr. at 359, 505). The nurse observed that plaintiff had no swelling in her hips or knees, her gait was steady, and she had full range of motion in her appendages. Therefore, she was told to continue taking Tylenol for pain. Three days later plaintiff saw the doctor to review her x-rays (Tr. at 360). The doctor told plaintiff to take Tylenol three times a day for three months. On March 26, 2009, the doctor directed that plaintiff's medical records from University Physicians be faxed to the prison "regarding arthritis and ruptured disk." (Tr. at 361, 507). Those records were received on March 30, 2009 (Tr. at 362). On April 2, 2009, plaintiff saw the doctor who reviewed the records from University Physicians (Tr. at 363). The records showed a fracture of her left hand on December 2, 2008; x-rays of the lumbar spine showed degeneration; x-rays of the left hip were negative; and there was an assessment of degenerative arthritis of the lumbar spine. The doctor assessed degenerative arthritis of the lumbar spine and told plaintiff to continue taking Tylenol.

On April 6, 2009, plaintiff's mother called the prison and spoke to a nurse about plaintiff's medical problems (Tr. at 363, 509). The nurse told plaintiff's mother that due to plaintiff's Hepatitis C and other health issues, plaintiff was being started on an APAP.[2] (Tr. at 363).

---

[2]CPAP (continuous positive airway pressure) devices are titrated to a single set pressure setting by a sleep specialist after a CPAP titration study. The titration study is conducted after a traditional in-lab polysomnogram test and is meant to find the exact

Case 2:15-cv-04109-REL   Document 29   Filed 08/29/16   Page 11 of 44

On April 21, 2009, plaintiff saw a nurse for treatment of Hepatitis C (Tr. at 365-366). Plaintiff was told, among other things, to stop smoking, exercise, and "avoid high doses of Tylenol." (Tr. at 366). "For the remainder of your life, do not drink alcohol at all, or only rarely, and speak to a physician prior to taking any new medications, including over-the-counter medications such as nonsteroidal anti-inflammatory drugs" (Tr. at 366-367).

On April 25, 2009, plaintiff saw a nurse and complained of severe pain in her back (Tr. at 370-371, 516-517). "I have a herniated disc and it is horrible and I have wanted a[n] x-ray since I got here in January. I need Naproxen and they will only give me Tylenol because of Hep C. I really don't care about the Hep C. I want Naproxen." Plaintiff's gait was described as "slow and steady," she had no discoloration on her back. Plaintiff was told she could not have Naproxen, to continue taking Tylenol.

On May 6, 2009, plaintiff again refused to schedule a sleep study; she said she "leaves in three weeks" (Tr. at 372, 504, 518).

On May 27, 2009, plaintiff was discharged from a 120-day drug treatment program (Tr. at 657). Her aftercare/continuing recovery recommendations and relapse prevention plans included "securing employment."

There are no medical records for the next 13 months.

─────────────────────

pressure needed to set the machine to eliminate apnea events during the night. On the other hand, APAP therapy has two pressure settings: a low range pressure setting (which is the minimum amount of pressure required to prevent apnea events), and a high range pressure setting. APAP machines have a complex algorithm that detects on a breath-by-breath basis what pressure the patient needs at that moment to prevent apnea events. Never straying below the low-pressure setting nor above the high-pressure setting, the APAP device finds the ideal pressure for any given moment.

On June 10, 2010, plaintiff saw Sarmistha Bhalla, M.D. (Tr. at 410). Plaintiff reported being very irritable. She denied depression "but still has residual voices." Plaintiff's mental status exam was normal except for auditory hallucinations. She was assessed with major depressive disorder, recurrent, moderate. Risperdal (antipsychotic) was prescribed.

July 14, 2010, is plaintiff's amended alleged onset date.

On November 8, 2010, plaintiff saw Laura Morris, M.D. (Tr. at 427-429). Plaintiff requested a refill of Flexeril (muscle relaxer) which she said helps her back pain. Plaintiff had also been doing water aerobics which helped her back pain; however, she said she could no longer do that because it was too expensive at the pool during off season. Plaintiff said she had lost 18 pounds since the spring with Weight Watchers but was frustrated with her weight. She requested a referral for bariatric surgery. Plaintiff continued to smoke. Her physical exam was normal. "She smokes and I strongly encouraged she proactively quit since this will impact her surgical candidacy and healing profile. . . . Back pain - recommend increase activity, stretching exercises. Refill Flexeril x1. Weight loss would certainly help."

On December 22, 2010, plaintiff saw Sarmistha Bhalla, M.D. (Tr. at 404-409). "Pt reports that last week the family celebrated their Christmas and it was stressful. She has been doing fine otherwise. She has been having stable mood[s]. She is med compliant and denies side effects. Still waiting on her disability." No mental symptoms were present. Plaintiff was observed to be cooperative with a normal mood and appropriate affect, good eye contact, normal speech, local flow of thought, normal

13

thought content, no hallucination, no delusions, and well oriented. Her motor activity

was normal, insight and judgment were fair. Dr. Bhalla assessed major depressive

disorder, recurrent, moderate. Plaintiff was continued on Risperdal and Lexapro

(antidepressant).

On February 22, 2011, plaintiff saw Jack Wells, M.D., for cold symptoms (Tr. at

415-420). Plaintiff continued to smoke 1 1/2 packs of cigarettes per day. Plaintiff's

"problem list" included obstructive sleep apnea "confirmed," osteoarthritis "confirmed,"

and polysubstance abuse "confirmed." During his exam, Dr. Wells noted that plaintiff

was cooperative with appropriate mood and affect. She was assessed with upper

respiratory infection and sinus infection and was prescribed antibiotics and Flexeril as

needed for spasm. She was advised to stop smoking.

On February 28, 2011, plaintiff was evaluated by Bryce Koelling, a chiropractor

(Tr. at 384-390). Her chief complaint was lower back pain, neck pain, and upper back

pain. Plaintiff rated her back pain a 6 out of 10. Her gait appeared normal. She

weighed 319 pounds. Her grip strength was normal. Plaintiff had decreased range of

motion in her cervical spine and decreased range of motion in her lumbar spine (exact

measurements were not provided) with moderate pain. Plaintiff had tenderness and

swelling in her shoulders and back. X-rays showed subluxation (a slight misalignment

of the discs) in the cervical, thoracic and lumbar spine. Dr. Koelling assessed lumbar

subluxation, lumbo-sacral area sprain/strain, cervical subluxation and thoracic

subluxation. Dr. Koelling designed a treatment plan involving cold packs, adjustments,

therapeutic exercises, and traction. Adjustments were performed during this visit.

14

On March 3, 2011, plaintiff saw Bryce Koelling, D.C., for adjustment (Tr. at 383). Plaintiff rated her back pain a 5 out of 10.

On March 8, 2011, plaintiff saw Bryce Koelling, D.C., for adjustment (Tr. at 382). She rated her back pain a 5 out of 10, aggravated by bending, lifting, walking and prolonged sitting and relieved by lying down. Plaintiff had moderate pain in her left shoulder and stiffness in her left elbow. Plaintiff was told to use cold packs for 20 minutes at a time twice a day. She was to have chiropractic adjustments twice a month, traction to reduce disc inflammation and paraspinal muscle spasms, and to perform therapeutic exercises at home.

On March 10, 2011, plaintiff saw Bryce Koelling, D.C., for adjustment (Tr. at 381). Plaintiff described her back pain as a 4.

On March 17, 2011, plaintiff saw Bryce Koelling, D.C., for adjustment (Tr. at 379). Plaintiff described her back pain as a 4. Plaintiff was told to use cold packs for 20 minutes at a time twice a day.

On March 24, 2011, plaintiff saw Bryce Koelling, D.C., for adjustment (Tr. at 378). Plaintiff described her back pain as a 4.

On April 7, 2011, plaintiff saw Bryce Koelling, D.C., for adjustment (Tr. at 377). Plaintiff described her back pain as a 3 with treatment. She indicated that her pain is relieved by lying down. Bending, lifting, walking and prolonged sitting worsen her condition. Plaintiff had moderate pain in her left shoulder and stiffness in her left elbow.

On April 20, 2011, plaintiff saw psychiatrist Sarmistha Bhalla, M.D. (Tr. at 403). "Pt reports that she has been doing fine. She has been having stable mood. She is

15

med compliant and denies side effects.  Still waiting on her disability.  She is tired of borrowing from her mom.  She reports that the only concern now is sleep disturbance." No mental symptoms were observed.

On May 3, 2011, plaintiff saw Bryce Koelling, D.C., for adjustment (Tr. at 376). Plaintiff described her back pain as a 3 with treatment.

On May 10, 2011, plaintiff saw Bryce Koelling,  D.C., for adjustment (Tr. at 375). Plaintiff described her back pain as a 3 with treatment.

On June 23, 2011, plaintiff saw Sarmistha Bhalla, M.D. (Tr. at 399-402).  "Pt reports that she was doing fine but got 3 tickets for driving with revoked license and is going to court next month.  She still [has] stable mood but is stressed.  She is med compliant and denies side effects.  Still waiting on her disability.  She reports her mom said that if she gets jail time she cannot live with her."  Plaintiff was assessed with major depressive disorder, recurrent, moderate.  Her GAF was 65.  Plaintiff was continued on her same medication.

On August 11, 2011, plaintiff saw Sarmistha Bhalla, M.D. (Tr. at 395-398).  "Pt reports that she was doing fine but got 3 tickets for driving with revoked license and went to court and spen[t] 10 days now has been stressed as she feels no one is her friend.  She still [has] stable mood but is stressed.  She has been denied of disability again.  She has not been taking risperdal and so was discontinued.  She says she did not like how it [made] her feel."  She was assessed with major depressive disorder, recurrent, moderate, and polysubstance dependence in sustained full remission.  Her

GAF was 60.  Plaintiff was prescribed Abilify (antipsychotic), and she was told to continue her other medications.

On September 29, 2011, plaintiff saw Jack Wells, M.D. (Tr. at 421-423).  Among other symptoms, plaintiff had a swollen, very painful right neck.  During a review of systems plaintiff reported neck pain and joint pain.  On exam she was noted to be alert and oriented, cooperative, with appropriate mood and affect.  Plaintiff was assessed with upper respiratory infection.

On October 12, 2011, plaintiff saw Sarmistha Bhalla, M.D. (Tr. at 391-394, 451-454).  Plaintiff reported that she was doing better.  "Her court cases are gone and judge did not send her to jail.  Her anger is under control.  She still [has] stable mood.  She has been denied of disability again and reapplied.  She has not been taking risperdal and so was discontinued.  She is not even taking abilify and trazodone [antidepressant]."  Dr. Bhalla noted that no mental symptoms were present.  Plaintiff was assessed with major depressive disorder, recurrent, moderate, and polysubstance dependence in sustained full remission.  Her GAF was 65.  She was prescribed Lexapro and Ambien (treats insomnia).  Risperdal, Abilify and Trazodone were discontinued.

On October 21, 2011, plaintiff saw Jack Wells, M.D., requesting weight loss pills (Tr. at 412-414, 704).  "She states she has been getting amphetamines from another provider, however she would like to get them from us because of billing issues.  She says they have helped her to lose weight and she has been sharing someone else's amphetamines as well.  We instructed her that our practice does not include

17

amphetamine prescription for weight loss. We would be happy to manage her weight loss should she want to register for an appointment so we could do a physical examination, lifestyle evaluation, laboratory studies, and proceed. She elected not to do that." Dr. Wells's clinical impression was "obesity, drug-seeking behavior. Diagnosis: Patient was denied amphetamine medications and left."

On November 1, 2011, Marc Maddox, Ph.D., reviewed plaintiff's medical records and found that her mental impairment is not severe (Tr. at 430-441). He found that she has mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. In support of his findings, Dr. Maddox discussed plaintiff's psychological exam on July 27, 2009; her medical records which, despite a diagnosis of major depressive disorder, reflect no mental symptoms through 2010 and 2011; in October 2011 she was doing better despite not taking most of her prescribed medications; plaintiff's doctor noted drug-seeking behavior after she requested amphetamines and said she had been using someone else's for weight loss, but left the doctor's office and declined any weight loss management treatment other than amphetamines. Dr. Maddox noted that plaintiff alleged symptoms in virtually every physical and mental domain which is inconsistent with the medical records.

On December 7, 2011, plaintiff saw Sarmistha Bhalla, M.D. (Tr. at 447-450). Plaintiff reported she was doing better. Her anger was described as under control even though she "got into it" with her mom a couple days earlier. Plaintiff had not been taking any of her psychiatric medication. Dr. Bhalla observed that plaintiff had no

18

mental symptoms present. She assessed a GAF of 65, which was the highest it had been during Dr. Bhalla's treatment of plaintiff. Dr. Bhalla told plaintiff to take her medication (Lexapro and Ambien) and follow up in 8 weeks.

On February 14, 2012, plaintiff saw Sarmistha Bhalla, M.D. (Tr. at 443-446). "Pt reports that she thinks that she needs her risperdal as she is getting irritable. She was in jail for driving while suspended. She has been denied of disability again and reapplied. They want to start from scratch. She is sleeping and eating well. She reports that she got involved in shop lifting and again another legal case pending on her." Dr. Bhalla noted that plaintiff had no mental symptoms present. During a mental status exam, plaintiff was found to be cooperative, irritable, well oriented, with appropriate affect, good eye contact, normal speech, logical flow of thought, normal thought content, no hallucinations or delusions, normal motor activity, fair insight, and fair judgment. She was assessed with major depressive disorder, recurrent, moderate, and with polysubstance dependence in sustained full remission. Her Axis IV diagnoses were family problems (severe), occupational problems (severe), problems with primary support (severe), and legal problems (severe). Dr. Bhalla restarted Risperdal and told plaintiff to continue taking Ambien and Lexapro.

On February 16, 2012, plaintiff had individual therapy with June Dillon (Tr. at 685). Plaintiff discussed her criminal thinking and talked about her arrest for stealing alcohol. The therapist noted that plaintiff's story in therapy contradicted her previous story and placed the blame for her crime "on the store and not herself."

On March 1, 2012, plaintiff had individual therapy with June Dillon (Tr. at 686). She had started volunteering at the Clothes Cupboard three mornings a week and said she enjoyed her time there.

On March 7, 2012, plaintiff had individual therapy with Virginia Caputy (Tr. at 682). Plaintiff was having difficulty living with her mother because she had no money to help her mother with expenses. Plaintiff was volunteering at the Clothing Cupboard on Wednesdays.

On June 5, 2012, plaintiff underwent an intake evaluation after having been taken into custody for a charge of stealing (Tr. at 459, 462). Her previous mental health records were reviewed. She was currently prescribed Lexapro and Risperdal. Her drug of choice was listed as cocaine: "not since 2009, used for 30 years." Plaintiff reported that she was "coping ok." Her mental status exam was normal except she had slurred speech and a lethargic mood. The prison psychiatrist ordered that plaintiff continue on her medications.

On June 7, 2012, plaintiff refused her Celexa and Risperdal (Tr. at 532). She was counseled on the risks of not taking this medication.

On June 11, 2012, plaintiff complained of chronic back pain and bilateral knee pain since 2006 (Tr. at 532). She indicated that "movement" exacerbates her pain which she described as a 9/10 at rest and a 10/10 with activity (Tr. at 533). Plaintiff's gait was steady. She was able to bend forward at the waist 45 degrees (Tr. at 533).

On June 12, 2012, plaintiff was observed to appear lethargic but cooperative (Tr. at 460-461). Plaintiff said she wanted to take care of her elderly mother and feared her

mother's death.  A mental status exam was performed and plaintiff was noted to have normal thought process, slow motor activity, depressed mood with anxiety, a tearful affect, normal insight and judgment.  Plaintiff  was assessed with  mood disorder not otherwise specified with psychotic features, and polysubstance dependence, clean since 2009.

On June 13, 2012, plaintiff had x-rays which showed mild thoracic spondylosis (arthritis) and rotoscoliosis (curvature and rotation of the spine) (Tr. at 542).

On June 16, 2012, plaintiff saw the prison psychiatrist (Tr. at 462).  Plaintiff said she first saw a psychiatrist two years ago and was prescribed Lexapro for depression but most recently had been taking Celexa and Risperdal for rage associated with her mood.  Plaintiff was observed to have a stable mood and pleasant affect.  "She has no auditory or visual hallucinations. . . .  She has detailed speech and normal intelligence. She has insight into her illness and good judgment in accepting treatment."  She was assessed with major depressive disorder.  Citalopram (also called Celexa, an antidepressant) and Risperidone (also called Risperdal, an antipsychotic) were prescribed.

On June 18, 2012, plaintiff complained of pain in her knees, hands and shoulder since 2006 (Tr. at 546-547).  She also complained of back pain and said in the past she had been prescribed Flexeril and vitamins.  "Turning" and "any movement" exacerbate her pain which she described as a 9/10 both at rest and during activity.  She reported muscle spasms in both arms and legs after sitting for a while or moving (Tr. at 547). Plaintiff's gait was steady; she was able to bend forward at the waist to 90 degrees

(normal). Plaintiff grimaced during "the whole visit and more so when asked to bend over." (Tr. at 548). Plaintiff was told to engage in low impact activity such as walking to maintain joint movement. She was told to take Tylenol for pain, and do range of motion exercises to maintain movement and mobility.

On June 21, 2012, plaintiff complained of chronic back pain (Tr. at 550). Plaintiff said nothing helped her pain which she described as a 7/10 at rest and a 10/10 with activity (Tr. at 551). Plaintiff's gait was steady.

On June 24, 2012, plaintiff refused her medication (Risperdal) (Tr. at 553).

On June 25, 2012, plaintiff said she "needed something done" because she was snoring so badly at night her roommates were telling on her (Tr. at 554). She was referred to the prison doctor for evaluation. She also complained of chronic back pain (Tr. at 555). Plaintiff said her treatment before being incarcerated consisted of Bioflex (over the counter joint health supplement), glucosamine (over the counter supplement for joints), Flexeril (muscle relaxer), Aleve (over the counter non-steroidal anti-inflammatory) and water aerobics. She rated her pain an 8/10 at rest and a 10/10 with activity; however, she did not grimace during the encounter and she had a steady gait. Plaintiff weighed 304 pounds.

On June 26, 2012, plaintiff refused her Risperdal (Tr. at 559).

On June 27, 2012, plaintiff refused her Risperdal (Tr. at 560-561). That same day she had a pulmonary function test which was normal (Tr. at 558).

Plaintiff refused her Risperdal on June 29, 2012; June 30, 2012; July 1, 2012; July 2, 2012; and July 4, 2012 (Tr. at 561-566).

On July 3, 2012, plaintiff reported persistent fatigue due to sleep apnea (Tr. at 538). She also reported joint pains affecting her hips and knees, and numbness in her left leg. Plaintiff weighed 298 pounds. She was continued on Tylenol, and an overnight oxygen saturation observation was scheduled.

On July 7, 2012, plaintiff had an oxygen saturation sleep study (Tr. at 568). Her oxygen saturation was 96 to 97% while snoring, with a heart rate of 78. During apneic episodes, her oxygen saturation dropped to 82% with no change in heart rate. After apnea, she returned to heavy snoring and oxygen saturation was up to 97% after the first or second breath.

On July 8, 2012, and July 10, 2012, plaintiff refused her Risperdal (Tr. at 569, 571).

On July 11, 2012, plaintiff reported that she was "doing well" and that her mood swings, anxiety and racing thoughts were "all down to at least half." She was having no auditory or visual hallucinations. She said she had adjusted to being in prison. Her mental status exam was completely normal (Tr. at 464-465). She was fully oriented with normal memory, no suicidal or homicidal thoughts, no hallucinations or delusions, normal motor activity, normal appearance, normal mood and affect, normal insight and judgment. Plaintiff had been refusing Risperdal -- she said it made her too sleepy and "she has been doing fine without it." She had not taken Risperdal in two weeks. Her Risperdal was discontinued.

On July 16, 2012, plaintiff saw the nurse and complained of joint pain in her hands, knees, hips and back (Tr. at 574). Plaintiff weighed 304 pounds. She had

"partially decreased range of motion related to weight issues." (Tr. at 575). Plaintiff was encouraged to do low impact activity such as walking to maintain joint movement, and she was encouraged to lose weight.

On July 20, 2012, plaintiff saw the prison doctor to go over the results of her sleep study (Tr. at 570). She weighed 302 pounds. Plaintiff reported spontaneously falling asleep during the day along with persistent fatigue. She was assessed with obstructive sleep apnea as well as hyperlipidemia due to the results of her blood work. She was counseled on diet and exercise, and a CPAP was ordered.

On July 23, 2012, plaintiff saw a prison doctor who went over her pulmonary function test (Tr. at 578-579).

On July 25, 2012, plaintiff saw a prison doctor about a condition unrelated to her disability application (Tr. at 577). Plaintiff denied any other problems. She was noted to be morbidly obese at 297 pounds.

On July 31, 2012, plaintiff saw the prison doctor about the doctor's request for issuance of a CPAP (Tr. at 579). Plaintiff had indicated she had a sleep study before she was incarcerated, and she was directed to request records of her outside sleep study (Tr. at 579).

On August 1, 2012, plaintiff saw the prison nurse for a follow up on Hepatitis C (Tr. at 580-585). Plaintiff reported her first IV drug use in 1981, and her last IV drug use in 2003. She denied lethargy and fatigue. She had lab work done to check her liver function. Plaintiff was told to stop smoking, exercise, avoid high doses of Tylenol, avoid

24

fatty foods, and to talk to a health care provider before her release from prison about ways to avoid spreading Hepatitis to others after she was released.

On August 9, 2012, plaintiff denied hallucinations (Tr. at 465-466). Her mental status exam was completely normal.

On August 11, 2012, plaintiff refused her Celexa (Tr. at 589).

On August 24, 2012, plaintiff saw the prison doctor for a follow up on sleep apnea (Tr. at 588). She weighed 305 pounds. Plaintiff was told the medical records from Callaway County did not include a sleep study report as plaintiff had said. She "signed a transfer of records request for U of MO Hospital which she feels has sleep study records."

On August 26, 2012, plaintiff saw the prison psychiatrist for a follow up (Tr. at 466). She reported feeling OK but said she was having a hard time getting up because of sleep apnea and the fact that her alarm clock had broken. The doctor observed that plaintiff appeared to be cooperative but tired and dysphoric. "She reported her concentration and memory as not good. No thought disorder. Limited insight and judgment." Plaintiff was continued on Citalopram. "She seems to have some dysphoria, it is hard to differentiate whether it is due to the depression or sleep apnea or just depression of her personality style. Very limited motivation."

On August 28, 2012, plaintiff failed to show up for a Hepatitis B vaccination (Tr. at 590).

On September 4, 2012, plaintiff saw the prison doctor and denied any complaints related to her asthma (Tr. at 592). Plaintiff weighed 310 pounds.

On September 6, 2012, plaintiff reported that she was doing well, she was observed to be neat and clean, goal directed, fully oriented, with normal speech, normal motor activity, normal insight and judgment. Her mood was anxious -- "she was anxious to get to medication line 'not to miss her meds'".

On September 7, 2012, plaintiff saw the prison nurse (Tr. at 595). Plaintiff was alert and fully oriented, her speech was clear, her gait was steady. She weighed 311 pounds. Her breathing was deep and unlabored. She had full range of motion in her extremities and no edema.

On September 22, 2012, plaintiff had an appointment with the prison psychiatrist (Tr. at 467). She showed up for the appointment but refused to be evaluated.

On October 4, 2012, plaintiff said she was doing well (Tr. at 467-468). "Is 'working, I found out I can work'". Plaintiff said she planned to work when she was released from custody. She denied hallucinations. Her mental status exam was normal except that her speech was "pushed", she was animated and her insight and judgment were described as "grandiose." She was told to continue with her positive routine.

On October 11, 2012, plaintiff saw a prison nurse to renew her Tylenol for joint pain (Tr. at 605-606). Plaintiff weighed 302 pounds. Plaintiff was encouraged to do low impact activity such as walking.

On October 15, 2012, plaintiff reported that she had been fired from her job in the kitchen and had moved to another housing unit (Tr. at 468-469). She felt she had

been falsely accused. Plaintiff denied hallucinations. Her mental status exam was normal except she had an irritable mood.

On November 4, 2012, plaintiff saw the prison psychiatrist (Tr. at 469). Plaintiff said for the most part her mood had been pretty good. She was sleeping well although she still had sleep apnea. She reported no problems with her medication. Her mental status exam was normal. Plaintiff reported that her concentration and memory were "OK, not very good since head injury due to MVA in 1985." The psychiatrist continued plaintiff on Citalopram and noted that plaintiff "seems to be doing well."

On November 9, 2012, plaintiff saw the prison doctor for a follow up on sleep apnea and history of degenerative joint disease (Tr. at 608-609). Plaintiff weighed 307 pounds. Plaintiff's sleep study records confirmed significant sleep apnea. Plaintiff's Tylenol was renewed and she was referred to another doctor for a CPAP.

On November 14, 2012, plaintiff had a follow up and said she had started working as a dorm tender but was having some physical problems (Tr. at 469-470). Plaintiff denied hallucinations. Her mental status exam was normal except she had an irritable mood and appeared restless.

On November 16, 2012, plaintiff saw a doctor for issuance of a CPAP and was admitted to the infirmary (Tr. at 609-610). She was told to use oxygen at night (Tr. at 613). Multiple times plaintiff was observed sleeping with her oxygen turned off, and she was awakened and told that she needs to wear the oxygen any time she is asleep (Tr. at 614, 616). She was released from the infirmary on November 19, 2012 (Tr. at 619).

On November 24, 2012, plaintiff refused her Celexa (Tr. at 621).

27

On December 3, 2012, plaintiff refused her medication (Tr. at 625).

On December 4, 2012, plaintiff had x-rays which showed possible degenerative changes in the right shoulder (Tr. at 622).

On December 17, 2012, plaintiff had a follow up and reported snoring and sleeping all the time (Tr. at 470-471). Her mental status exam was normal except her mood was described as down.

On December 23, 2012, plaintiff was walking back from the medicine line and her knee popped -- "now it hurts so bad I can't put weight on it." (Tr. at 630). Plaintiff's gait was steady and she had full range of motion without weight bearing. She had "slight swelling" in the back of her left knee. Plaintiff was offered a wheelchair and crutches, but she refused (Tr. at 632). An ice pack was issued and an Ace wrap was applied. She walked about 20 feet after leaving the medical unit but then returned and requested a wheelchair.

On December 26, 2012, plaintiff was seen in follow up for her knee (Tr. at 634). Plaintiff denied any specific complaint regarding her mental health. She did not cry, she was not hostile or angry, she was not withdrawn, she was fully oriented and denied any manic behavior (Tr. at 636). Plaintiff's wheelchair and Ace bandage use were extended.

On January 2, 2013, plaintiff saw a nurse to return the Ace wrap and wheelchair (Tr. at 636). Plaintiff was upset and said she was unable to walk. "Pt is noted to get up without using arms of wheelchair and ambulate around the room then down the hall to exit medical without difficulty. Pt states that if something happens then it is Medical's

28

fault.  Explained to pt there was no bruising or inflammation and that she needs to follow protocol and return to sick call if pain and other symptoms persist." (Tr. at 636). On that same day plaintiff refused her Celexa (Tr. at 637).

On January 14, 2013, plaintiff underwent "discharge planning" in the Department of Corrections (Tr. at 471-472).  Plaintiff denied suicidal or homicidal ideation, she denied hallucinations.  She was observed to be fully oriented with normal speech, normal motor activity,  normal mood, normal affect, intact insight and judgment, and goal directed thought processes.  Nothing abnormal was observed in her mental evaluation.  Plaintiff was anticipating being released on February 28, 2013, and a follow up appointment was made for her at Options Unlimited for March 1, 2013.

On January 26, 2013, plaintiff reported that her mood was "pretty good" (Tr. at 472).  Aside from feeling very sleepy and having sleep apnea, plaintiff "denied any other problems."  She denied side effects of medication and "talked about bad left knee."  Plaintiff was observed to be cooperative, she had normal speech and motor activity, her mood was OK, her affect was neutral, she had no thought disorder, her motivation was fair, she had adequate insight and judgment.  Her Citalopram, 40 mg, was continued.  "She seems to be doing well - at her baseline."

On February 1, 2013, plaintiff denied any complaints regarding her mental health (Tr. at 641).  She was fully oriented, she was not crying, not withdrawn, not hostile, not angry, and exhibited no manic behavior.

On February 6, 2013, plaintiff had a medical follow up and reported "no complaints" regarding her mental health (Tr. at 472, 644).  She was fully oriented with

29

no crying, was not hostile or angry, and she displayed no manic behavior.

On February 11, 2013, plaintiff had a medical follow up and reported "no complaints" (Tr. at 473).

On February 19, 2013, plaintiff refused her medication (Tr. at 645).

On February 27, 2013, plaintiff was released from prison (Tr. at 647). She weighed 311 pounds on this date (Tr. at 648).

On March 1, 2013, plaintiff met with Virginia Caputy at East Central Missouri Behavioral Health Services for a new client intake (Tr. at 663-669). Plaintiff said she was able to care for herself and also assisted her mother. Her goal was listed as follows: "Client wants to have some control over her life and be able to support herself through disability." She was assessed with Bipolar I Disorder, currently manic, and polysubstance dependence in sustained full remission.

On April 10, 2013, plaintiff saw Dr. Wells for an infection (Tr. at 706). She was smoking 1/2 pack of cigarettes per day. She was noted to be alert, oriented, and cooperative with appropriate mood and affect.

On April 22, 2013, plaintiff saw Dr. Wells complaining of left knee pain (Tr. at 708-710). "[S]he stated she had an injury of her knee several weeks ago. No evidence of any decreased range of motion of the knee at this point." Plaintiff denied back pain, she also denied any muscle spasm. She had no musculoskeletal complaints other than her knee pain. Plaintiff had a normal gait.

On May 3, 2013, plaintiff saw Dr. Wells for left knee pain and for a disability evaluation (Tr. at 711-714). "Has no CPAP machine since she turned it down before.

Did qualify before due to sleep studies.  Turned down CPAP machine.  Referred to bariatric surgery and declined lap band surgery."  Plaintiff continued to smoke a half a pack of cigarettes per day.  Plaintiff had a normal gait.  She was alert, oriented, and cooperative with appropriate mood and affect and normal judgment.  "Not likely to be able to work due to CHI [closed head injury] and bipolar."

As of June 1, 2013, plaintiff was disabled according to the findings of the ALJ.

## C.   SUMMARY OF TESTIMONY

During the October 10, 2013, hearing, plaintiff testified; and Suzanne Hullender a vocational expert, testified at the request of the ALJ.

## 1.   Plaintiff's testimony.

At the time of the hearing, plaintiff was 52 years of age and is currently 55 (Tr. at 40).  She was 5'9" tall and weighed around 335 pounds (Tr. at 40).  Plaintiff has never been married and has no children (Tr. at 40).  She lives in a house with her mother who is retired (Tr. at 41).  Plaintiff does not have a driver's license (Tr. at 41).  Plaintiff graduated from high school in 1979 (Tr. at 41).  She went through Basic Essential Skills Training for pipefitting, and vocational rehabilitation provided her with commercial driver training (Tr. at 42).  Plaintiff drove a truck for Kingdom Projects (Tr. at 42).

Plaintiff has not worked since July 14, 2010, her amended alleged onset date (Tr. at 42).  She stopped working on January 27, 2009 (Tr. at 42).  At that time she worked for a sheltered workshop (Tr. at 43).  First she would drive around to businesses to pick up recyclables (Tr. at 43).  She had two helpers who would do the physical part of the job (Tr. at 43, 69).  Then in 2007 she got a DUI and lost her license,

31

and her job duties changed to straightening coat hangers and sharpening pencils (Tr. at 69). Plaintiff did that full time -- her boss made her feel like if she did not work full time her job would be on the line (Tr. at 43). Plaintiff left that job because her probation was revoked and she went into custody where she participated in a 120-day behavior modification program (Tr. at 43).

Plaintiff's most limiting condition is bipolar disorder (Tr. at 44). She hears voices that tell her to do things that she should not be doing or that she does not want to do (Tr. at 44). The voices began around 2007 and are pretty much constant, "always talking and carrying on" (Tr. at 49, 50). The voices tell plaintiff that she is a big loser (Tr. at 50). She used to deny hearing voices when asked by her doctors, but that was because she was embarrassed (Tr. at 63).

Plaintiff goes into slumps where she does not respond to people, she just stays at home (Tr. at 44). If she could stay at home and just sleep and eat she would be content for the rest of her life (Tr. at 44). Plaintiff does not trust anyone and does not want to be around anyone (Tr. at 44). She had a closed-head in jury in 1985 and she is now very rigid (Tr. at 44). On the way to the hearing, plaintiff was "barking" at her mom, even though she recognized that her mom and sister are the ones who keep plaintiff from being homeless (Tr. at 44).

Most of plaintiff's days are bad days (Tr. at 50). On a good day, she wakes up a lot at night, sleeping for 20 to 30 minutes at a time, roams around, makes coffee, goes out on the front porch to smoke (Tr. at 50-52). On a bad day, she sleeps all day (Tr. at 66). She has crying spells once a day (Tr. at 66-67). Plaintiff's mother does the

cooking (Tr. at 51). Plaintiff helps with the dishes, folds laundry, makes sandwiches, warms soup, and does some of the cleaning (Tr. at 52). Plaintiff sometimes goes grocery shopping with her mother, but typically her mother will get the groceries when she is already in town (Tr. at 52-53).

Plaintiff tries to see a psychiatrist at least once a month, she sees a psychologist every two weeks, and she has family counseling through her parole officer every two weeks (Tr. at 45). Plaintiff goes to church on Sundays (Tr. at 53). She attends meetings for United Methodist Women on Mondays (Tr. at 53). She helped in the kitchen at a dinner for that organization (Tr. at 53). Plaintiff has chickens as pets, and she likes to watch television (Tr. at 63). She also likes to eat (Tr. at 63). Plaintiff can watch movies "if they're cute," and if the movie or television program is not very good, she will not stay and watch it because she loses interest (Tr. at 64). Plaintiff used Facebook on her telephone in the past, but since getting out of custody she only checks it at the library once in a while (Tr. at 64). Plaintiff does not read for pleasure because she does not comprehend very well and stumbles over words (Tr. at 65). It is difficult for her to follow recipes because it is difficult for her to read (Tr. at 65). Plaintiff is not able to figure out bills -- her mother does that (Tr. at 65).

Plaintiff described a time when she was waiting for coffee to be brewed -- she was leaning on the kitchen counter and fell asleep and fell on the floor (Tr. at 53-54). Plaintiff's Ambien helps her fall asleep but does not help her stay asleep (Tr. at 54). Plaintiff was diagnosed with sleep apnea but she does not have the money to get a CPAP (Tr. at 54).

33

Plaintiff's medications cause her mouth to be dry (Tr. at 47).  At the time of the hearing she had been taking Invega (antipsychotic) for two weeks; before that she was on Haldol (antipsychotic) but did not like it because she woke up feeling hung over (Tr. at 47-48, 49).

Plaintiff was recently at the doctor due to advanced osteoarthritis in her knees, back, hands and hips (Tr. at 55).  Plaintiff has not had any Cortisone injections yet (Tr. at 55).  She applied for Medicaid but was denied (Tr. at 55).  Plaintiff has ruptured disks in her lower back; and her hands, elbows and shoulders hurt constantly (Tr. at 57).  Plaintiff takes Mobic (non-steroidal anti-inflammatory) for her arthritis (Tr. at 57).  She is supposed to take Acetaminophen (Tylenol) because she has Hepatitis C (Tr. at 57).

Plaintiff can sit for 30 to 40 minutes at a time (Tr. at 58).  She can stand for 10 minutes at a time (Tr. at 58).  She can walk about 35 feet (Tr. at 59).  She can lift and carry 10 to 15 pounds (Tr. at 59).  Plaintiff's right arm is more restricted than her left; she fell and jammed her elbow, and in 1985 she was paralyzed from a car accident and had to go through physical therapy (Tr. at 60).  Plaintiff cannot reach overhead (Tr. at 60).  Plaintiff has trouble kneeling, crawling, stooping, crouching, bending and squatting (Tr. at 60-61).  Plaintiff has difficulty gripping (Tr. at 61).  She has to have her mother help her in the shower and help her wipe when using the toilet (Tr. at 62-63).  Plaintiff has trouble with memory -- she has to write her doctor appointments in a planner (Tr. at 61-62).  Plaintiff has problems with concentration and focus (Tr. at 62).  When plaintiff was trying to work, she had problems getting along with people (Tr. at 62).  Being locked up had a lot to do with it -- people in authority would try to tell her this way is the

34

right way when she knew the other way was the right way (Tr. at 62).  But she knows

better now (Tr. at 62).

## 2.    Vocational expert testimony.

Vocational expert Suzanne Hullender testified at the request of the

Administrative Law Judge.  The first hypothetical involved a person who could perform

light work except the person would need to alternate between sitting, standing and

walking every 45 minutes at will for a brief position change of no more than five minutes

but would be able to continue working at the work station.  The person could do no

overhead reaching; could occasionally climb ramps and stairs; could never climb

ladders, ropes or scaffolds; must avoid concentrated exposure to vibration and work

hazards; would be limited to simple, routine, repetitive tasks; could have only

occasional interaction with coworkers, supervisors, and the general public; could have

only occasional changes in the work setting; and could not work in a setting where

alcoholic beverages are made or sold (Tr. at 72-73).  The vocational expert testified that

"the combination of occasional contact with the general public and the need to sit or

stand at the light level is very limiting."  (Tr. at 73).  The vocational expert testified that

such a person could work as a small products assembler, light, SVP 2, DOT 706.684-

022 with 473 jobs in Missouri and 18,000 in the country (Tr. at 73).  The number of jobs

would be reduced by 25% to accommodate the sit/stand alternative (Tr. at 73).

If the person were to be off task 5 percent of the work day on a consistent basis,

the person could not work (Tr. at 73).  Absences exceeding one per month on a regular

and consistent basis would preclude employment (Tr. at 74).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Cynthia Hale entered her opinion on December 17, 2013 (Tr. at 12-25).  Plaintiff's last insured date was September 30, 2013 (Tr. at 14).

Step one.  Plaintiff has not engaged in substantial gainful activity since her amended alleged onset date (Tr. at 14).  Although she worked in a sheltered workshop after her incarceration, such work is not considered substantial gainful activity (Tr. at 14).

Step two.  Plaintiff has the following severe impairments:  obesity, status post fracture of the left small finger requiring pinning, degenerative disc disease of the cervical spine, degenerative joint disease of the left AC joint, a mood disorder (variously described as both major depression and bipolar disorder), an anxiety disorder, and history of polysubstance dependence (Tr. at 14).  As of June 1, 2013, plaintiff also had the additional severe impairments of severe obstructive sleep apnea, degenerative disc disease of the lumbar spine, and bilateral patellofemoral (knee) arthritis (Tr. at 14).

Plaintiff alleged difficulty sleeping prior to June 1, 2013; however, there was no sleep study confirming a diagnosis of sleep apnea until after this date, plaintiff declined a sleep study in May 2009, and she refused a CPAP machine prior to June 1, 2013 (Tr. at 15).  Plaintiff complained of back pain and left knee pain prior to June 1, 2013; however, there were no objective studies and limited examination findings of the back or knees prior to June 1, 2013 (Tr. at 15).

Plaintiff has a history of Hepatitis C; however, there is no record of this condition impacting her work related activities (Tr. at 15).  Plaintiff was treated for bladder

incontinence; however, she has not alleged any functional limitations from this impairment (Tr. at 15). Plaintiff's cellulitis is not a severe impairment because she had two instances of cellulitis, each briefly and 2 1/2 years apart and therefore this condition does not meet the durational requirement (Tr. at 15). Plaintiff was treated for COPD while incarcerated but prison health records do not reflect acute symptoms of shortness of breath and her pulmonary function tests and x-rays were normal (Tr. at 15).

Step three. Plaintiff's impairments do not meet or equal any listed impairment (Tr. at 15-17).

Step four. The ALJ considered the effects of plaintiff's obesity when determining her residual functional capacity (Tr. at 14). Prior to June 1, 2013, plaintiff was capable of performing light work in that she could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for 6 hours per day; sit for 6 hours per day; could not reach overhead; could occasionally climb ramps and stairs; could never climb ladders, ropes or scaffolds; had to avoid concentrated exposure to vibration and work hazards; was able to perform simple, routine and repetitive tasks requiring only occasional interaction with coworkers, supervisors, and the general public; could tolerate occasional changes in work settings; and could not work in settings where alcoholic beverages were made or sold (Tr. at 17).

As of June 1, 2013, and thereafter, plaintiff can perform sedentary work in that she can lift and carry 10 pounds; stand or walk for 2 hours per day; sit for 6 hours per day; cannot reach overhead; can occasionally climb ramps and stairs; can never climb ladders, ropes or scaffolds; must avoid concentrated exposure to vibration and work

hazards; can perform simple, routine and repetitive tasks requiring only occasional interaction with coworkers, supervisors and the general public; can tolerate occasional changes in work settings; may not work in settings where alcoholic beverages are made or sold; and would be off task 15 percent of the day (Tr. at 22). The ALJ found that the objective and clinical evidence intensifies after June 1, 2013, consistent with a significant reduction in her residual functional capacity (Tr. at 22). After June 1, 2013, x-rays of plaintiff's knees revealed degenerative changes, x-rays of the lumbar spine revealed loss of lordosis or levoscoliosis versus mild scoliosis, physical examinations revealed pitting edema in the leg and decreased reflexes in the knees (Tr. at 22). Although plaintiff had no sleep study and refused a CPAP prior to June 1, 2013, afterward she had two sleep studies and was treated with a CPAP (Tr. at 22-23). Records reflect stable moods and minimal findings prior to June 1, 2013, but show a deterioration in her mental condition after that date (Tr. at 23).

Plaintiff has no past relevant work (Tr. at 23).

Step five. Prior to June 1, 2013, plaintiff was capable of working as a small products assembler, light, unskilled, with 473 jobs in Missouri and 18,000 in the country (Tr. at 24). After June 1, 2013, there were no jobs available in significant numbers in the national economy that plaintiff could perform and therefore the ALJ found her disabled as of that date (Tr. at 24).

## VI.     PROPER HYPOTHETICAL

Plaintiff argues that the ALJ erred in finding that plaintiff could perform the job of small products assembler because only one hypothetical question was posed to the

vocational expert, and that hypothetical did not match the residual functional capacity as determined by the ALJ.

The ALJ found that plaintiff was capable of performing light work in that she could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for 6 hours per day; sit for 6 hours per day; could not reach overhead; could occasionally climb ramps and stairs; could never climb ladders, ropes or scaffolds; had to avoid concentrated exposure to vibration and work hazards; was able to perform simple, routine and repetitive tasks requiring only occasional interaction with coworkers, supervisors, and the general public; could tolerate occasional changes in work settings; and could not work in settings where alcoholic beverages were made or sold.[3] In finding at step five of the sequential analysis that plaintiff was capable of performing other work, the ALJ noted:

> The hypothetical posed of the vocational expert during the hearing was more restrictive than the eventual residual functional capacity outlined in the findings above. As such, it is logical that if the claimant could perform this occupation with the more restrictive hypothetical question, she would be able to perform this job under the construct of the less restrictive residual functional capacity.

(Tr. at 24).

The more restrictive hypothetical was the same as the residual functional capacity found by the ALJ but with this added restriction: the person would need to alternate between sitting, standing and walking every 45 minutes at will for a brief

---

[3]Without any further elaboration, I find that the substantial evidence in the record supports the ALJ's residual functional capacity finding.

position change of no more than five minutes but would be able to continue working at the work station.

An ALJ is required to include only those limitations in a hypothetical to a vocational expert which he finds credible. Gilbert v. Apfel, 175 F.3d 602, 604 (8th Cir. 1999); Sobania v. Secretary of Health Educ. & Human Servs., 879 F.2d 441, 445 (8th Cir. 1989); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988).  The hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ. Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999) (holding that the ALJ need not include additional complaints in the hypothetical not supported by substantial evidence); Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001).  Where a hypothetical question precisely sets forth all of the claimant's physical and mental impairments, a vocational expert's testimony constitutes substantial evidence supporting the ALJ's decision. Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a vocational expert's testimony is substantial evidence when it is based on an accurately-phrased hypothetical capturing the concrete consequences of a claimant's limitations); Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990).

When a hypothetical question is more restrictive than the residual functional capacity assigned to a claimant by an ALJ, the hypothetical is sufficient so long as it encompasses all of the restrictions in the residual functional capacity.  Miller v. Astrue, 233 Fed. Appx. 590, 2007 WL 1452966, *2 (8th Cir., May 18, 2007) (hypothetical which is more restrictive than the residual functional capacity assessment sufficient so long as it includes all of the impairments that the ALJ found to be substantiated by the record);

<u>Fredrick v. Colvin</u>, -- F.Supp.3d --, 2016 WL 755647, *6 (W.D. Mo., February 25, 2016) ("[I]f the vocational expert could offer jobs that exist in the national economy under a more restrictive hypothetical, those same jobs would necessarily still apply to Fredrick's less-restrictive RFC."); <u>Graffis v. Colvin</u>, 2015 WL 5098776, n.5 (E.D. Mo., August 11, 2015) (hypothetical that is more restrictive than the residual functional capacity the ALJ found constitutes sufficient evidence, and any discrepancy between the hypothetical and residual functional capacity is harmless error); <u>Hanson v. Colvin</u>, 2013 WL 4811067, *23 (D. Minn., September 9, 2013); <u>McGowin v. Astrue</u>, 2013 WL 655159, *10 (E.D. Mo., February 22, 2013); <u>Vann v. Astrue</u>, 2012 WL 651412, n. 68 (W.D. Mo., February 28, 2012); <u>Robinson v. Astrue</u>, 2010 WL 481045, *17 (E.D. Mo., February 4, 2010).

Because the vocational expert testified that a person with all of the restrictions found by the ALJ (and then some) could perform substantial gainful activity, her testimony constitutes substantial evidence that a person with the residual functional capacity assessed by the ALJ would not be disabled.

## VII.    *AVAILABLE IN SIGNIFICANT NUMBERS*

Plaintiff argues that the Acting Commissioner did not meet her burden of establishing that plaintiff is capable of performing other work existing in significant numbers.

The vocational expert listed assembler, small parts I, as the single occupation available to an individual based on the ALJ's hypothetical residual functional capacity question during the hearing.  This RFC was primarily adopted by the ALJ in [her] written decision finding the Plaintiff was not disabled and not entitled to benefits.  The vocational expert clearly stated that this was the only

occupation she would be able to come up with at the light level. She then stated that there were only 473 jobs in the state of Missouri and 18,000 of these jobs in the national economy but that they would be reduced by 25%.

(plaintiff's brief, p. 14).

Although the vocational expert did indeed testify that the 473 jobs available in Missouri should be reduced by 25%, this was based on the sit/stand option which the ALJ ultimately declined to adopt.

> Your Honor, that combination of occasional contact with the general public and the need to sit or stand at the light level is very limiting. The, the only possible occupation that I, I can identify is assembler, small products I. . . . There are 473 estimated in Missouri, 18,000 estimated in the U.S. economy. And I would recommend a reduction of 25 percent on those numbers *to accommodate for the sit stand alternative.* . . .

(Tr. at 73) (emphasis added).

Title 42, United States Code, Section 423(d)(2)(A) provides that "'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." If the claimant is capable of performing substantial gainful activity which exists in the national economy, he is not disabled -- it does not matter whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. Id.

There is no bright-line rule for what constitutes a "significant number" of jobs. "[I]n determining whether work exists in significant numbers, . . . [t]he decision should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation." Jenkins v. Bowen, 861 F.2d

1083, 1087 (8th Cir. 1988). "The Court of Appeals for the Eighth Circuit has upheld an ALJ's determination that 200 regional jobs and 10,000 national jobs were sufficient." Foster v. Colvin, 2016 WL 29637, *4 (W.D. Mo., January 4, 2016) (citing Johnson v. Chater, 108 F.3d 178, 180 (8th Cir. 1997)). See also Craigie v. Bowen, 835 F.2d 56, 58 (3rd Cir. 1987) (200 jobs in the region); Haynie v. Colvin, -- F.Supp.3d --, 2016 WL 1718392 (W.D. Arkansas, April 29, 2016) (18,000 jobs in the national economy).

In the case before me, the vocational expert testified that there were 473 positions in Missouri and 18,000 positions in the country that plaintiff was capable of performing. The ALJ found that this was a significant number of jobs (Tr. at 23). Because the decision of what constitutes a significant number is left to the common sense of the ALJ, and because these numbers have been held to be significant in other cases, I find that the record establishes that plaintiff could perform work "existing in significant numbers in the national economy."

## VIII.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff was not disabled from July 14, 2010, through her onset date of June 1, 2013. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 29, 2016